United States District Court
Southern District of Texas

**ENTERED**

June 22, 2016

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

## GALVESTON DIVISION

| | | |
|---|---|---|
| ANNETTE GONGORA o/b/o G.I.B., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-15-263 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMIN., | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable George Hanks, United States Distrcit Court Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), is a social security appeal in which the parties have filed cross motions for summary judgment (Docket Entry (Dkt.) No. 12 (Plaintiff) and No. 15 (Defendant)). Having considered the Parties' submissions, the administrative record[1] and the applicable law, the Court submits its Report and Recommendation to the District Court.

## I. BACKGROUND & PROCEDURAL HISTORY

On October 11, 2012, Annette Gongora (hereinafter, "Gongora" or "Plaintiff"), on behalf of her minor son, G.I.B. (hereinafter "G.I.B" or "Claimant"), filed an application for SSI

---

[1] The Commissioner filed the 449-paged administrative record electronically. (Dkt. No. 9).

benefits[2] with the Social Security Administration ("SSA"). (Transcript (Tr.) 55). In the application, Gongora contends that G.I.B. is disabled and that he has been since his birth on December 11, 2011, due to congenital anomalies of his legs which included bilateral hip displasia (DDH), bilateral equivovarus deformity[3] and bilateral arthrogryposis[4] of the knees. (Tr. 55, 234). Gongora's application was denied initially and on reconsideration. She appealed the denial and requested a hearing before an Administrative Law Judge ("ALJ") to review the decision.

On December 6, 2013, a hearing was held before ALJ Gary J. Suttles in Houston, Texas. During the nineteen (19) minute hearing, the ALJ heard testimony from Gongora and briefly interacted with nearly two-year-old G.I.B, who attended the hearing with his mother. (Tr. 37-53). Following the hearing, the ALJ issued a decision on February 12, 2014, which was unfavorable to G.I.B. (Tr. 19-32). Gongora appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals, however, in a letter dated April 29, 2015, the Appeals Council notified Gongora that it declined to review the ALJ's determination (Tr. 1), which rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107

---

[2] SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110.

[3] Commonly referred to as clubfooted, the deformity is described "as fixation of the foot[/feet] in adduction, in supination and in varus, i.e., inclined inwards, axially rotated outwards and pointing downwards." http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1571059. Initial treatment normally includes "serial careful manipulations and immobilization with strapping or casts," however, this is not always effective and "many cases still require surgery and disability often persists despite treatment." *Id.*

[4] Arthrogryposis is a persistent flexure or contracture of a joint. The syndrome is characterized by congenital immobility of joints, fixed in various postures, with lack of muscle development and growth. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (28th ed. 1994).

(2000). On September 21, 2015, Gongora filed the instant action seeking judicial review of the Commissioner's denial of G.I.B's claim for SSI benefits. (Dkt. No. 1).

## II. APPLICABLE LEGAL STANDARDS & BURDENS

### A. Judicial Review

Judicial review of administrative decisions by the Commissioner are limited.[5] A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 472, 473 (5th Cir. 1999); *see also*, *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir.1995) (a court is tasked with "scrutiniz[ing] the record to determine whether it contains substantial evidence to support the Commissioner's decision").

As defined in the Act, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also*, *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir.1991) (when considering the record, the court must weigh the objective medical facts, the diagnoses and opinions from treating physicians, subjective evidence of pain and disability, and the claimant's age and education). If the Commissioner's findings are adjudged to be supported by substantial evidence, then such findings are conclusive and must be affirmed. *Id.* A finding of no substantial

---

[5] Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.

3

evidence is appropriate when no credible evidentiary choices or medical findings exist to support the decision (*Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988)) or when the decision was reached by applying improper legal standards. *Singletary v. Brown*, 798 F.2d 818 (5th Cir. 1986).

When reviewing an administrative decision, the court is not permitted to re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *Johnson*, 864 F.2d at 343-44. Instead, conflicts in the evidence are for the Commissioner, not the court, to resolve. *Brown*, 192 F.3d at 496.

## B. Standard for Entitlement to Social Security Benefits

An individual requesting benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. To be eligible for SSI, the claimant must have a disability. *See* 42 U.S.C. §§1382(a), 1382c(a)(3)(A)-(C). When the claimant is a child under the age of eighteen, the Act defines a disability as "a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i); *see also*, 20 C.F.R. §416.906.

When evaluating a claimant's eligibility for benefits, the ALJ utilizes a three-step sequential process. First, the ALJ must determine if the claimant is engaged in substantial gainful activity. 20 C.F.R. §416.924. Second, if the claimant is not so engaged, then the ALJ determines whether the claimant has a medically determinable impairment(s) that is severe. *Id.* An impairment(s) will not be deemed severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id.* Third, if an

4

impairment(s) is severe, it also must meet, equal, or functionally equal a listed impairment. *Id.*

## III. DISCUSSION

The decision in this case reflects that the ALJ utilized the three-step sequential process for evaluating a child's disability. Specifically, the ALJ determined that G.I.B. had not engaged in substantial gainful activity since the application date; that G.I.B. suffered from severe impairments of arthrogryposis and muscle alignment/fascia disorder; and that G.I.B. did not have an impairment or combination of impairments that met, medically or functionally equaled a listed impairment. (Tr. 22, 25-31). The ALJ, therefore, concluded that G.I.B. was not disabled under the Act and denied his application for SSI benefits. (Tr. 31-32).

Gongora does not challenge the ALJ's findings at steps one or two of the sequential process. Instead, her challenge in the present case is directed at the ALJ's functional equivalence analysis at step three. The Commissioner maintains that the decision should be upheld because the ALJ properly considered all the evidence and followed the applicable law when determining functional equivalence at step three. (Dkt. No. 15).

### A. The Functional Equivalence Determination

At step three of the sequential process, the regulations provide that if a claimant's impairments do not meet or medically equal a listing, the ALJ must determine whether his impairments functionally equal the listing. 20 C.F.R. §416.926a(a). To functionally equal a listing, the claimant's impairment must result in either a "marked"[6] limitation in two domains of

---

[6] The term "marked" refers to a limitation that is more than "moderate," but "less than extreme" and seriously interferes with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(2).

5

functioning _or_ an "extreme"[7] limitation in one domain. _Id._ The six domains of functioning are as follows: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1); _see also, Harris v. Apfel_, 209 F.3d 413, 417 (5th Cir. 2000).

When evaluating the severity of the impairments in each of these domains,[8] the ALJ must consider how the claimant's impairments affect his physical and/or mental functioning. 20 C.F.R. §§416.924a, 416.926a. In doing so, the ALJ must evaluate the extent and quality of the claimant's activities (_e.g._, if the claimant can perform age appropriate activities, how well he can perform the activities, and how much help he needs to perform the activities) and he must then "compare [the claimant's] functioning to the typical functioning of [same-aged children] who do not have impairments." _Id._

A principal source of information regarding how the claimant's impairments affect his functioning commonly comes from the claimant's treating physician and/or other medical sources who have seen the claimant and can provide the ALJ with their medical findings and opinions about any such limitations and restrictions. 20 C.F.R. §416.926a. Additional sources of information include the claimant's parents, his teachers or others individuals who have had

---

[7] The term "extreme" limitation is assessed when the impairment(s) interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities, however, it does not necessarily mean a complete lack or loss of ability to function. 20 C.F.R. §416.926a(e)(3).

[8] Notably, each domain describes what a child should be able to do through the five age categories (_e.g._, (1) newborns and young infants (birth to age 1); (2) older infants and toddlers (age 1 to 3); (3) preschool children (ages 3-6); (4) school-aged children (ages 6-12); and (5) adolescents (ages 12-18). 20 C.F.R. §416.926a(g)(2)-(l)(2).

6

sufficient contact with the claimant – both in terms of frequency and duration – to describe his functioning both inside and outside the home. *Id.* When evaluating the different sources of information, the ALJ must always consider the standards used by the person who provided the information. 20 C.F.R. §§416.924a, 416.927.

In this case, the administrative record contains different sources of information concerning G.I.B.'s functioning – namely, his medical records, several medical opinions and information from Gongora. With these sources of information in the record, the ALJ determined that, despite having severe impairments of arthrogryposis and muscle alignment/fascia disorder (Tr. 22), G.I.B.'s impairments resulted in "less than marked" functioning in each of the six domains (Tr. 27-31), which meant that G.I.B did not have an impairment that functionally equaled any of the impairments listed in Appendix 1, Subpart P, of Regulation No. 4 and, therefore, the ALJ concluded that he was not disabled under the Act. (Tr. 25, 31-32).

## 1. The Treating Physician's Opinion

In her first point of error, Gongora argues that the ALJ failed to examine any of the factors for assessing opinion evidence, committed legal error by misstating the regulations, and did not "do justice" to Claimant's treatment history. (Dkt. No. 12). The Commissioner contends that good cause existed for the ALJ to discount the treating doctor's opinion.

It is a well-established rule that "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)); *see also, Perez v. Barnhart*, 415 F.3d 457, 465–66

7

(5th Cir.2005) (opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's condition and treatments should be accorded considerable weight in determining disability); *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981) (recognizing that unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight."). The treating physician's opinions are not conclusive and "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton*, 209 F.3d at 455. Good cause must exist, however, for the ALJ to do so. *Id.* Good cause exists when the treating doctor's opinion is conclusory; stands unsupported by medically acceptable clinical, laboratory, or diagnostic techniques; or is otherwise unsupported by the evidence. *Id.* at 456.

When the ALJ declines to accord controlling weight to a treating source, then he must apply the following factors in determining the weight to give to the opinion, 1) length of treatment; 2) nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors. 20 C.F.R. §416.927(d)(2)(6). Additionally, the regulation is construed in Social Security Ruling ("SSR") 96–2p, which states:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

SSR 96–2p, 61 F.R. 34490, 34491 (July 2, 1996) (emphasis added).

In the present case, the administrative record contains four medical opinions assessing how G.I.B.'s physical impairments effect his functioning with regard to each of the six domains. Contained among these opinions is an opinion from G.I.B.'s treating doctor, Dr. Douglas A. Barnes, M.D. (Tr. 279-280).[9] Dr. Barnes, who specializes in Orthopedics and is the Chief of Staff of Shriner's Hospital, completed a Childhood Disability Evaluation Form on November 5, 2012. (Tr. 279-280). In his evaluation, Dr. Barnes stated his opinions stemmed from G.I.B.'s "multiple congenital lower extremity contractures, substantial gross motor milestone delay, multi-directional instability of knees, and severe plantar flexion deformity of both ankles and forefeet." (Tr. 280). Dr. Barnes also stated that his evaluation of G.I.B. was based on his treatment and the prognosis of his congenital conditions which he explained would require the following: "surgery to reduce forefoot and ankle plantarflexion contractures"; "AFO brace molding and application"; and the need for "substantial early childhood intervention for multiple years" which would include physical therapy and, in all likelihood, the use of "long leg braces +/- walker" that will result in "reduced mobility and poderance." (Tr. 280). In light of G.I.B.'s

---

[9] Aside from the treating physician's opinion, the administrative record contained three other medical opinions. One of the medical opinions came from Dr. Maria Nguyen after she performed a consultative examination of then 15 month old G.I.B. on March 28, 2013. In her written report, Dr. Nguyen noted that G.I.B. was wearing his AFOs bilaterally and "both hips appear to be extremely rotated, both legs are shortened and appear atropic." (Tr. 64-73). She further noted that while G.I.B. had "good strength bilaterally, [he] is unable to ambulate" and is, instead, only "able to scoot on his bottom 'with legs on the side.'" (Tr. 68). Based on the exam, Dr. Nguyen expressed her medical opinion that G.I.B. had "marked" limitations with regard to the domain of moving about and manipulation of objects. (Tr. 69). The two remaining medical opinions came from separate non-examining physicians. The first of these evaluations was completed by Dr. Monica Fischer, M.D. in November 13, 2012, which was at or near the time Dr. Barnes completed his domain assessment. (Tr. 58-62). Dr. Fischer opined that G.I.B. had "marked" limitations in the Health and Well-Being domain. Approximately five months later Dr. Nicol performed another domain evaluation and opined that G.I.B.'s physical impairments created "marked" limitations in the domain of moving about and manipulating objects. (Tr. 69-70).

9

impairments, Dr. Barnes opined that G.I.B. had "marked" limitations in functioning with regard to the domain of attending and completing tasks and "extreme" limitations in functioning with regard to the domains of moving about and manipulating objects and caring for himself.[10]  (Tr. 279).

Insofar as a claimant's disability will functionally equal the listing if it results in marked limitations in two domains of functioning or an extreme limitation in one domain, Dr. Barnes's report, if accepted, would seem to qualify G.I.B. on both bases, for benefits.  However, rather than afford Dr. Barnes's opinion controlling weight, the ALJ's decision reflects that he assigned it "little weight" because he considered Dr. Barnes's opinion to be inconsistent with other evidence in the record.  (Tr. 27).  The ALJ explained the basis of his determination as follows:

> [a]s for the opinion evidence, the undersigned gives little weight to Dr. Barnes' opinion that the [C]laimant has marked limitation in attending and completing tasks and extreme limitation in the areas of moving about and manipulating objects and caring for yourself [citation omitted].  The medical opinion of a treating physician concerning the nature and severity of an impairment is entitled to appropriate consideration pursuant to SSR 96-2, that is, if it is well-supported and not internally inconsistent or inconsistent with other pertinent clinical evidence.  In the instant case, the claimant requires continued treatment and therapy, but even with reduced mobility and some instability of gait, he is mobile and able to ambulate, even without his AFO's.

(Tr. 27).  Insofar as the ALJ refused to give controlling weight to Dr. Barnes' opinion, the ALJ was required to engage in a detailed analysis of the §416.927(d)(2) factors.  The ALJ failed to do so.  While the ALJ recognized that Dr. Barnes was an "orthopedic doctor" (Tr. 26) and that he

---

[10] Dr. Barnes also opined that G.I.B. had "less than marked" limitations in the domain of health and physical well-being and "no limitations" in acquiring and using information and interacting and relating with others.

saw G.I.B. for a follow-up visit in September 2013, at which point he recommended additional surgery be performed (Tr. 24), the Court cannot conclude that this constitutes a "detailed analysis." *Beasley v. Barnhart*, 191 Fed. Appx. 331, *4 (5th Cir. July 25, 2006) (unpubl.) (citing *Newton v. Apfel*, 209 F.3d 448 (5th Cir.2000) (ALJ failed to perform detailed analysis, where the ALJ neither recited the factors, nor discussed all of them). Nor can the Court conclude that any such error was harmless because Dr. Barnes's opinion could reasonably support a finding of disability. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir.2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights); *Beasley v. Barnhart*, 191 Fed. Appx. 331, *4 (the ALJ's failure to complete the requisite "detailed analysis" is an error that affects the claimant's substantial rights, thereby requiring remand); *Costanza v. Astrue*, 2007 WL 4699149 (W.D.La. Nov. 29, 2007) (recognizing that ALJ's failure to perform detailed analysis affects the claimant's substantial rights).

Nonetheless, the Commissioner maintains that the ALJ's decision reflects that he had "good cause" for discounting Dr. Barnes's opinion because G.I.B. experienced "significant improvement" in his condition since Dr. Barnes authored his opinion in November 2012. (Dkt. No. 15). This is not supported by substantial evidence. At best, the medical records contain sporadic and often misconstrued notations [11] that can hardly be considered good cause for rejecting

---

[11] The ALJ appears to have unfairly characterized the contents of the records when he stated that G.I.B.'s PT goals "were almost met" when, in fact, the records clearly reflect that the aim of therapy was to get G.I.B. to the point where he could undergo surgery and, later, the therapist notes reflect that s/he could proceed no further without surgical intervention. (Tr. 339, 341). In addition, the ALJ mischaracterized the contents of the medical records when he noted that G.I.B. had undergone "hip surgery as well as surgery to the knees" and this treatment had improved his condition to the degree that he is able to ambulate. (Tr. 31). The records clearly reflect that while G.I.B. would require surgery on his knees and hips in the future, he had only at that point in time undergone surgery on his feet. (Tr. 26, 27).

11

Dr. Barnes's opinion. *See Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) (noting that where the record as a whole showed no genuine improvement, the ALJ's findings to the contrary are not supported by substantial evidence). Instead, the objective medical evidence, which includes the diagnostic studies (Tr. 273-277), appears to be entirely consistent with Dr. Barnes's diagnosis and assessment. For example, the medical evidence reflects that G.I.B. was born at Mainland Hospital on December 11, 2011, with congenital anomalies in both his legs which included a diagnosis of bilateral hip dsyplasia (DDH), bilateral equivovarus deformity (clubbed footed)[12] and bilateral arthrogryposis of the knees.[13] During the two years that followed his birth, the records chronicle the ongoing intervention efforts that G.I.B. has undergone (*i.e.*, a Pavlik harness (Tr. 206, 227); serial or repeated casting of his legs/feet (Tr. 201, 219, 223, 218-219, 245-246, 253, 291, 287, 401, 410-411, 417); physical therapy (Tr. 192,197-198, 206, 214, 223, 231, 233, 238-239, 241, 245-250, 419-420); surgery (Tr. 263-264, 268-271); and with orthotics and braces (AFOs and KAFOs on both his legs/feet). (Tr. 234, 258, 253, 285, 291, 289-290, 419-420, 423, 407-408)). Notwithstanding these efforts, the records reflect that G.I.B. continues to experience instability, limitations in the range of motion of his lower extremities due to the contractures, pain,[14] decreased muscle bulk, tone and strength. (Tr. 192-193, 195, 236. 245, 247-250, 260-263,

---

[12] While the records reflect G.I.B. was club-footed in both feet, the right deformity was recorded as 60° equines and 45° adduction and varus (*i.e.*, similar to a horse). (Tr. 189, 226-227)

[13] G.I.B. exhibits dysfunctional ROM in both knees (-5° to 90° on the right and -5° to 10° on the left) due to the contractures. (Tr. 189, 202, 211, 218-219, 226-227).

[14] The ALJ noted that G.I.B. "does not experience direct pain, unless he falls," however, this is contrary to both Gongora's testimony that several times a day G.I.B. will indicate to her that his legs hurt, as well as notations in the medical records which reflect that G.I.B. experienced pain upon examination. (Tr. 26, 48, 404, 419, 423).

341,416, 419-420, 422-423, 447). The records also document the significant developmental delays that have limited G.I.B.'s ability to ambulate in an age-appropriate manner.[15] (Tr. at 55, 227, 234, 299). Additionally, no one refutes that for several years to come G.I.B. will need substantially more early childhood intervention due to his club deformity and his bilateral knee contractures (Tr. 189, 341), which will take the form of additional surgeries, casting, and physical therapy. (Tr. 236, 260-263, 447-448). Moreover, even with all this intervention, it is expected that G.I.B. will probably require long leg braces and perhaps a walker. (*Id.*). Thus, despite any records suggesting modest improvements,[16] substantial evidence does not support the Commissioner's argument that the ALJ had "good cause" to discount Dr. Barnes's diagnosis and assessment on the ground that it was inconsistent with other evidence in the record.[17] On this basis, the decision should be remanded.

## 2. The Credibility Determination

Gongora next argues that the ALJ erred by failing to properly consider and evaluate her testimony. "In determining whether a child is disabled, the agency will accept a parent's statement of a child's symptoms if the child is unable to adequately describe them." 20 C.F.R. §416.928(a).

---

[15] For example, when G.I.B. was almost 16 months old he it was noted that he was unable to ambulate and, instead, was only "able to scoot on his bottom with his legs on the side." (Tr. 68).

[16] While the records reflect that progress had been made to correct G.I.B.'s *left* club foot, his *right* foot has remained "stubbornly" equinous to the point that he cannot wear the AFO and his therapist has noted that additional physical therapy is pointless until additional surgery is performed. (Tr. 339, 341). In addition, while the records contain a notation that G.I.B. has "relatively" good range of motion in his *right knee*, the notes reflect that this is in comparison to his left knee which has very limited mobility. (Tr. 189, 202, 211, 218-219, 226-227, 447).

[17] The Court pauses to note that, to the extent that the Commissioner argues that Dr. Barnes's opinion was inconsistent with Gongora's testimony concerning G.I.B.'s abilities, the record would not support this argument for the reasons discussed in the following section.

In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying. *Id.*; SSR 96–7p, 1996 WL 374186, at *2 fn. 2 (July 2, 1996). In doing so, "the [ALJ] must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96–7p, 1996 WL 374186, at *4 (July 2, 1996); . "This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision." *Id.*; *Briggs ex rel. Briggs*, 248 F.3d 1235, 1239 (10th Cir. 2001); *see also, Clifford v. Apfel*, 227 F.3d 863, 872 (7th 2000) (the requirement ensures that the ALJ makes an "accurate and logical bridge from the evidence to his conclusion").

In the present case, in addition to the Function Report - Child Age 1 to 3rd Birthday that she completed in mid-March 2013,[18] Gongora was the sole witness to testify before the ALJ at the December 2013 hearing. The transcript from the December 6, 2013 hearing, reflects that Gongora testified that G.I.B. was her first, and likely only, child. (Tr. 43). She explained that following his birth, she was instructed to place G.I.B. in a Pavlik harness and, in addition to the therapy he

_____

[18] In the March 19, 2013 report, Gongora responded that G.I.B. *could not:* crawl; stand without help; walk, sometimes, without holding onto someone or something; climb onto furniture; jump up and down or dance; walk up or down stairs by himself; run with or without falling down; or hold a crayon with his thumb and fingers instead of a fist. (Tr. 150). Gongora responded that G.I.B. *could* do the following: stand with help, throw a ball or object; stack blocks 2 high, but not higher; push and pull small toys; and scribble with crayon or pencil. (*Id.*). She explained that G.I.B. "does not walk by himself and he will never have a normal gait pattern. He has a hyper-extended/multi-directional knee that may never respond to treatment." (*Id.*). She further explained that G.I.B. is affectionate toward his parents; she responded "no" in response to whether he "plays next to other children but not with them"; and she explained that "[h]e is easily frustrated because he is not able to play with other children due to his disability." (Tr. 151). Gongora responded that G.I.B. does not cooperate in getting dressed or brush his teeth; he does not drink from a cup or glass without help or feed himself with a spoon; and he cannot undress by himself." (*Id.*). Finally, she explained that "[h]e will always have to wear AFO's on his legs to support his ankles and so his feet will go into his shoes." (*Id.*).

14

received at UTMB, she was instructed on how to perform home therapy during which she would hear G.I.B.'s joints "continuously pop" (*i.e.*, crepitus) from the stretches. (Tr. 46, 47).

When G.I.B. was approximately eight (8) months old, Gongora explained that she requested that his medical care and treatment be transferred from UTMB to Shriners' hospital because Shriners' had a speciality unit that provided care to children with similar congenital deformities. (Tr. 44). Following the transfer of his medical care, G.I.B. had surgery before he turned one year old and, since that time, he has worn orthotics and braces (AFOs and KAFOs) and, while he wasn't wearing them at the hearing, it was merely because they no longer fit and they were waiting for the new ones to be molded and fitted. (Tr. 43-44, 47). Gongora testified that G.I.B. will have to undergo additional surgeries in the future with the initial focus being on his right club foot and then, if successful, performing surgery on both of his knees. (Tr. 47, 51).

In terms of his activities, Gongora explained that G.I.B can walk for five to ten minutes before getting tired and, due to balance issues, he has to hold on to objects (*e.g.*, he uses his toy lawn-mower as a quasi-walker) to maintain his balance. (Tr. 47-48, 50-51). She also testified that G.I.B. is unable to crawl up onto furniture; get in/on a bed; climb up stairs; sit on the potty by himself; and step over or through a threshold of a door. (Tr. 48-49). Finally, Gongora testified that G.I.B. complains of pain in both his legs when he falls, but two to three times a day when he is merely sitting, he will also point to his legs and tell her they hurt. (Tr. 48).

While an ALJ "may find all, or only some, or none of an individual's allegations to be credible" (S.S.R. 96-7p, 1996 WL 374186, at *4 (July 2, 1996)), in this case the ALJ found Gongora's testimony concerning the intensity, persistence and limiting effects of the symptoms of G.I.B.' impairment to be "entirely credible." (Tr. 26). Notwithstanding this favorable

credibility assessment, the ALJ then made findings that were completely contrary to that determination. The ALJ did not explain this incongruity and the error could not have been harmless because Gongora's testimony could reasonably support a finding of disability, particularly had he compared G.I.B. abilities and activities to same-aged children without impairments. 20 C.F.R. §§416.924a, 926a. As a result of the incongruity, the decision warrants remand.

### 3. The ALJ's Determination

. Finally, while taking her issues out of turn, Gongora argues the ALJ's functional equivalence determination is not supported by substantial evidence because the ALJ failed to adhere to proper legal standards when evaluating the evidence. The Court agrees.

While the regulations make clear that the determination concerning functional equivalence rests with the Commissioner (20 C.F.R. §416.926a(d)), in reaching this determination, the ALJ is not permitted to "play doctor" by making his own independent medical assessments. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003). In this case, rather than rely on any of the medical opinions that were contained in the record,[19] the ALJ's decision clearly reflects that he did just that and based his findings on his own observations of G.I.B. at the hearing.[20] (Tr. 26-27). This was not proper. *Id.*; *see generally, Singletary v. Brown*, 798 F.2d 818 (5th Cir.

---

[19] *Supra* note 9. Notably, this is not a case where the ALJ favored any other medical opinion over that of Dr. Barnes. On the contrary, the ALJ's decision clearly reflects that not only did the ALJ discount Dr. Barnes's opinion concerning how G.I.B.'s impairments impacted his functioning with regard to particular domains, but he also ignored the other three medical opinions contained in the records.

[20] The transcript from the hearing reflects that during the nineteen minute session, it was observed that G.I.B. was not wearing his AFOs and KAFO and, when asked about this, Gongora explained that G.I.B. was not wearing them because they no longer fit and they were waiting for a new pair to be molded for him. The medical records supported Gongora's statements.

16

1986) (the ALJ's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards).

The ALJ's determination is flawed for another reason. When considering the claimant's functioning with regard to each domain, the regulations require the ALJ to examine a claimant's functioning compared to children the same age as the claimant "who do not have impairments." 20 C.F.R. §§416.924a, 416.926a. In his decision, the ALJ recited that he followed the applicable standards in accordance with 20 C.F.R. § 416.926a(b) and (c), and SSR 09-1p. He also noted examples of appropriate functioning for older infants or toddlers without impairments, as well as limitations children of various ages could manifest in the various domains, including the domain of moving about and manipulating objects. However, the ALJ's decision (*e.g.*, concluding that G.I.B.'s impairments resulted in "less than marked" limitation with regard each domain, including moving about and manipulating objects) clearly reflects that he did not compare G.I.B.'s functioning to that of a same-aged child without arthrogryposis and muscle alignment/fascia disorder, nor did he expressly assess how much assistance G.I.B. requires to function like a non-impaired same-aged child. *See* 20 C.F.R. §416.924a(5)(i) (indicating the ALJ must consider how independently a claimant is able to initiate, sustain, and complete activities "compared to other children [her] age who do not have impairments," including "the range of activities" a claimant performs, her ability to perform them independently, the pace of the activities, and the effort required to perform the activities); 20 C.F.R. §416.924a(5)(ii) (indicating the ALJ must consider how much "extra help [a claimant] need[s]...to participate in activities like other children his age without impairments"); S.S.R. 09-01p (stating the more help a child receives beyond what would be expected for a child the same age without impairments, the less independently the child

functions and the more severe the SSA will find the limitation). The Court concludes that remand

is, therefore, warranted to allow the Commissioner to address these errors.

## CONCLUSION

Considering the record as a whole, this Court concludes the Commissioner failed to apply

the correct standards in reaching her decision and it is not supported by substantial evidence. The

Court, therefore, **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (Dkt.

No. 15) be **DENIED**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 12) be

**GRANTED**, and that this action be **REMANDED** to the Social Security Administration pursuant

to Sentence 4 of 42 U.S.C. § 405(g), for further proceedings consistent with the determinations

made herein.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who

**SHALL** have until **July 8, 2016**, to have written objections, filed pursuant to 28 U.S.C.

§636(b)(1)(C). Failure to file written objections within the prescribed time **SHALL** bar the Parties

from attacking on appeal the factual findings and legal conclusions accepted by the District Judge,

except upon grounds of plain error.

**DONE** at Galveston, Texas, this **22ᵈ** day of June, 2016.

JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE

18